UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DIANE RICHARDS COOK,

      Plaintiff,

v.                                  ACTION NO. 2:15cv278

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Diane Richards Cook ("Cook") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381-1383(f). Specifically, Cook claims the ALJ improperly discounted the opinion of a treating physician and erred in evaluating her credibility. She claims these errors necessitate a remand. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and the Local Rules of this court. For the reasons stated below, this report recommends that the Court deny Cook's request for remand, grant the Commissioner's Motion for Summary Judgment, and affirm the final decision of the Commissioner.

## I.      PROCEDURAL BACKGROUND

Cook filed an application for disability benefits on December 22, 2011, alleging disability beginning August 1, 2009, due primarily to low back pain following a work-related injury. (R. 193-207). The Commissioner denied her application initially (R. 124-27), and upon

1

reconsideration. (R. 141-47). Cook requested an administrative hearing, which was conducted on November 21, 2013. (R. 42-68).

An Administrative Law Judge ("ALJ") concluded that Cook was not disabled within the meaning of the Social Security Act, and denied her claim for disability benefits. (R. 21-35). The Appeals Council denied review of the ALJ's decision, (R. 1-3), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Cook filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court to resolve the parties' cross-motions for summary judgment, and Cook's separate motion to remand.

## II.  FACTUAL BACKGROUND

Cook was forty-eight years old at the time of her alleged onset date, and fifty-three years old at the time of the ALJ's decision on this claim.[1] She graduated high school and has past relevant work as a sandwich maker/cashier, hand packer, nailing machine operator, assembler, and production worker. (R. 63-64). Her physical impairments primarily relate to a back injury she sustained in 2009 while lifting a bundle of door casings. (R. 361, 395).

Following her injury, Cook initially treated with Terrence Ryan, D.C. He diagnosed a mild to moderate lumbosacral strain and prescribed a course of chiropractic therapy, recommending that Cook stay off work for seven to ten days. (R. 353, 361-65). Her last treatment with Dr. Ryan was on October 26, 2009. (R. 365).

Also in October 2009, Cook presented to the Springfield Hospital Emergency Room complaining of lower back pain which was "[n]ot relieved by anything." (R. 395). Her physical

---

[1] The present application was Cook's second application for Social Security benefits. Her first claim, filed May 10, 2010, was denied and Cook did not seek review. Her current claim, filed December 22, 2011, alleges the same 2009 onset date. Cook, who is currently represented by counsel, did not seek to reopen her earlier claim, and neither the ALJ nor the parties suggest any different analysis would apply had she sought to do so.

2

examination revealed mild vertebral point and soft tissue tenderness, a normal range of motion, no motor or sensory deficit, negative straight leg raising test, and normal reflexes. (R. 396). She was diagnosed with a thoracic and lumbar strain, prescribed Vicodin, ibuprofen, and Flexeril, and referred for an MRI. (R. 397). The MRI performed on October 28, 2009 showed bilateral spondylosis at L-5, but no spondylolisthesis or other disc abnormalities. (R. 393, 404).

On October 29, 2009, Cook began treating with Charleston Family Medicine. She reported pain from her lumbar into her thoracic spine, and Dr. Jeffery Bell recommended she discontinue her chiropractic treatment. (R. 427). Her neurological examination was "completely normal." Id. In November 2009, Cook returned to Charleston Family Medicine, and Dr. Bell consulted the results of her MRI, which he observed did "not show any significant abnormality." Id. X-rays ordered that day revealed slight changes at T-8 and T-9, and minimal spondylotic lipping at T-11 to T-12. (R. 391).

In January 2010, Cook underwent an independent medical examination in connection with her worker's compensation claim. The examiner, Dr. William Boucher, noted that she had a normal gait, mild tenderness over the thoracic spine, but a full range of motion, though Cook did complain of pain, especially on extension. He also noted moderate tenderness in the lumbar spine with some guarding, but no localized spasm and a normal range of motion; tenderness over the right sacroiliac joint, normal lower extremity strength, and a negative straight leg raising test. (R. 375-76). Dr. Boucher also diagnosed a defused lumbosacral strain with sacroiliac involvement. He assessed her prognosis as good and opined that she could lift about fifteen pounds occasionally, eight pounds frequently, sit, stand, and walk for 30 minutes each at a time with occasional position changes, bend and twist occasionally, squat, kneel, and crawl moderately, climb stairs occasionally, push or pull about twenty five pounds, and work overhead

occasionally. (R. 379). He did restrict Cook from climbing ladders, but noted she had no restrictions regarding grip, pinching or repetitive hand use. Id. At that time, Dr. Boucher concluded that Cook could work full time at a light duty position. He recommended continued physical therapy and strongly suggested that Cook discontinue the use of any opiate pain relievers and focus on nonsteroidal, anti-inflammatory medicines. (R. 379-80).

On referral from Dr. Boucher, Cook also presented to occupational medicine specialist Carolyn Murray at the Dartmouth-Hitchcock Medical Center where she was referred for physical therapy. Dr. Murray's physical examination revealed a normal gait, 5/5 motor strength, and a negative straight leg raising test. Cook had "smooth flexion to > 90 degrees and good extension but pain at end range extension and with side bending." (R. 614). She assessed that Cook had myofascial pain syndrome, recommending anti-inflammatories, an active course of physical therapy, a trial of a TENS unit and light duty work to keep her engaged beginning at four hours per day. Id. Cook returned to Dr. Murray on March 5, 2010, reporting that despite the ability to change positions frequently, she became uncomfortable after about two hours. She had not yet completed five consecutive days of four-hour shifts, complained of trouble sleeping, and pain in the mid-to-low back with right side greater than the left. (R. 586). Her physical examination that day revealed pain on forward flexion with axial rotation, but no palpable spasm, a negative straight leg raising test, normal gait, and an otherwise normal neurological evaluation. Dr. Murry noted that Cook's "symptoms remain[ed] out of proportion to exam findings." Id.

Cook remained in physical therapy approximately once per week through April 2010. During an April appointment she reported to Dr. Murray that she had been fired for excessive absenteeism after calling in when she had an exacerbation of symptoms and was unable to work. (R. 591). Dr. Murray noted that Cook's lower extremity examination "remains completely

normal." (R. 592). Although Cook reported making no progress with physical therapy, (R. 591), by June 2010, she was able to do more work around the house, including vacuuming, doing dishes, and walking up to three miles per day. (R. 602-07).

Cook was first seen by Dr. Daniel Caloras for her back pain on September 29, 2010, following release from the Dartmouth Physical Therapy Program. On that date, she noted she was not working and continued to have low back pain, as well as tingling and numbness in the lower part of her legs. His physical examination noted that Cook had difficulty with flexion extension of her back with some discomfort, but a good range of motion and a negative leg raise test. Her hips revealed full range of motion without discomfort, and Dr. Caloras could not elicit tenderness to palpation of her lower back. She also had a normal gait. (R. 422). He prescribed a muscle relaxer and fibromyalgia medicine Lyrica. Id. She returned to Dr. Caloras in March 2011 requesting pain medication. At that time she stated that she had recently returned from the South where she had helped cared for her elderly mother and had a symptom flare up upon return. Dr. Caloras provided the medication and encouraged her to get involved in an exercise program. (R. 769). In October 2011, Dr. Caloras completed a medical questionnaire on Cook's behalf. He noted that she had thoracic spine pain, but that her prognosis was fair to good. (R. 766). Her treatment included exercise, physical therapy, and analgesics. But in his opinion, Cook could not sit or stand for up to three hours, had a limited ability to lift up to thirty pounds, and could climb a flight of stairs or walk 100 yards without rest. (R. 766). In a later visit, Dr. Caloras reviewed Cook's condition noting it had been two years since her back injury. She continued to have back pain, but Dr. Caloras's exam revealed a normal gait and station, normal sensation, reflexes, and a negative straight leg raising test bilaterally. (R. 752).

5

In May 2012, Cook returned to Dr. Caloras. He noted that she appeared uncomfortable. On exam he found moderate tenderness to palpation in the mid and lower thoracic spine (R. 740-41) and referred Cook to physical therapy at Springfield Hospital. (R. 741). On June 4, 2012, Cook returned to Dr. Caloras again complaining of dull aching lower back pain, but her physical examination remained unchanged. (R. 737-38). On that date, Dr. Caloras wrote a "To Whom It May Concern" note stating that Cook had chronic mid to low back pain and could not work full time or part time on a regular basis. (R. 731). On October 12, 2012, Dr. Caloras completed a lumbar spine impairment questionnaire at Cook's request. He now reported her prognosis as "poor to fair." He described her symptoms as pain mid back, noting that Cook was incapable of sitting or standing for prolonged periods. Reporting on his patient's ability to sit or stand, Dr. Caloras circled zero to one hour in an eight-hour day. He noted she could lift and carry ten to twenty pounds occasionally and that she would need to take unscheduled breaks approximately every thirty minutes. When asked to identify the clinical findings supporting his diagnosis, Dr. Caloras checked limited range of motion, tenderness and muscle spasm of the mid back, a slow gait, mid back muscle weakness, and trigger points in the upper lumbar region. He also noted no positive straight leg raising test, no muscle atrophy, sensory loss or reflex changes. (R. 784-89). In August 2013, Dr. Caloras wrote a more detailed letter in which he described having treated Cook since 2009, during which she had exhibited a limited range of mid-back motion, weakness and tenderness, as well as muscle spasms, (R. 830), and he reaffirmed the information in his impairment questionnaire from October 2012.

In addition to evidence from Cook's treating physicians, the record includes opinions from state agency physician Joseph Familant, M.D., who reviewed the record evidence in January 2013. Based on his review of the records, Dr. Familant concluded that Cook could

perform light work with the opportunity to change positions for two to three minutes every hour in order to relieve pain.  In support of his opinion, Dr. Familant observed that Cook's physical examinations had been largely normal with a normal gait and station, normal strength, normal deep tendon reflexes and sensation.  (R. 102-03).

In a function report completed in connection with her application for benefits, Cook stated that she was able to care for her personal needs, including bathing, dressing, preparing meals, and performing household chores, such as washing dishes, sweeping, and laundry.  She stated that she needed help with heavier tasks, such as vacuuming, mopping, raking or mowing the lawn.  (R. 303-04, 309).  She was able to shop for groceries, spend time with others, enjoy meals out occasionally, and attend sporting events, including high school softball.  (R. 306).  At the hearing, Cook testified that she has difficulty sleeping as a result of her back pain, and as a result, often naps during the day.  She stated that bending, kneeling, sitting, and standing all exacerbate her pain.  Although she had previously taken Percocet for her pain, she thought it made her too sleepy, and at the time of the hearing, she was relying on over-the-counter medications.  She also stated that reclining or lying down helps, but she rated her daily pain as a seven to eight on a scale of ten.  (R. 59-60).  She testified that she could stand for 10 minutes and sit for 30-45 minutes depending on the chair.  She described being able to walk for 10 minutes and carry fifteen pounds.  (R. 60-61).  But stated she had to alternate her position approximately every 30 minutes.  (R. 61).  She has a driver's license but drives only two to three times per month.  (R. 47).  Asked what she does in a typical day, Cook stated that she did not do much of anything, relating that her husband did the majority of the housework, although she occasionally did light housework and cooking.  She stated she primarily passed the time watching the television, visiting with her mother-in-law, and reading.  (R. 53-54).

In addition to Cook's testimony, the ALJ heard from a Vocational Expert ("VE").  The VE first assessed Cook's previous employment, describing her work as a sandwich maker/cashier as light unskilled.  Her work at the door production company involved several jobs, including hand packer, light unskilled; nailing machine operator, medium semi-skilled; and an assembler, medium unskilled.  (R. 63-64).  Thereafter, the ALJ asked the VE to assume an individual complainant's age, education, and work experience who was limited to light work allowing her to alternate between sitting and standing with only occasional bending, crouching, or kneeling, and no use of ladders.  The VE testified that such an individual could work as an information clerk, office helper, and cashier.  (R. 64-65).  The ALJ then asked if the same individual also required frequent unscheduled breaks resulting in being off task more than 15 percent of the day, and the VE testified there would be no work.  In response to questions by Cook's counsel, the VE stated that an individual limited to standing and walking less than one hour out of an eight hour work day, and only occasionally lifting no more than twenty pounds on a sustained basis would still be able to work as an information clerk, office helper, and cashier.  (R. 66-67).  Finally, the VE testified that an individual absent more than three times per month as a result of health conditions would be unable to work.  (R. 67).

## III.  STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389,

401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)).  It

consists of "more than a mere scintilla" of evidence, but may be somewhat less than a

preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d

585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.   "Where conflicting evidence allows

reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76

F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence,

are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  Thus, reversing the denial of

benefits is appropriate only if either the ALJ's determination is not supported by substantial

evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517

(4th Cir. 1987).

## IV.    ANALYSIS

To qualify for Supplemental Security Income under the Social Security Act, 42 U.S.C. §§

1381 – 1383(f), an individual must file an application for benefits and be under a "disability" as

defined in the Act.  42 U.S.C. §§ 416(i), 423.  The Social Security Regulations define disability

as the inability to do any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. §

404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A).  To meet this definition, a

claimant must have a "severe impairment" which makes it impossible to do previous work or any

other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a);

9

see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

20 C.F.R. § 1520(1)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. See id. §§ 404.1520, 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational

background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.     The ALJ's Decision

In this case, the ALJ found that Cook had not engaged in substantial gainful employment since her onset date of August 1, 2009. She had severe impairments of lumbar spondylosis, degenerative disc disease, and a meniscal tear of the left knee, but her impairments did not meet or equal a listed impairment. Based on all of the limitations imposed by her impairments, the ALJ concluded Cook could perform a limited range of light work with specified postural limitations and a sit/stand option. With this residual functional capacity ("RFC"), Cook retained the ability to perform a significant number of jobs in the national economy, including information clerk, office helper, and cashier. As a result, the ALJ found that she was not disabled.

Cook's Motion for Summary Judgment makes related arguments which challenge the ALJ's conclusion that she retained the ability to perform light work. First, she claims the ALJ improperly discounted the medical source opinion from her treating provider, Dr. Caloras, and an examining occupational physician, Dr. Boucher. She also contends that the ALJ erred by giving great weight to a non-examining agency physician with an unrelated specialty, Dr. Familant. Finally, Cook argues that the ALJ erred by only partially crediting her own descriptions of her pain and improperly assessed her credibility. This report considers each argument in turn below.

## B.     The ALJ properly evaluated the evidence bearing on Cook's RFC.

Cook contends that the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see

SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). At the administrative hearing level, the ALJ alone has the responsibility of determining the RFC. Id. at § 404.1546(c). An RFC is determined by considering all the relevant medical and other evidence[2] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Cook has the RFC to perform a limited range of light work with specified limitations, including the ability to alternate sitting and standing. He also permitted only occasional bending, crouching or kneeling, and required that Cook avoid ladders. (R. 28).

Cook contends that the RFC isn't supported by substantial evidence because the ALJ gave "little weight" to the opinions of two treating physicians, and "great weight" to the opinion of a non-examining agency doctor. (ECF No. 10, at 15). Specifically, she claims the ALJ did not properly weigh the testimony of her treating physicians, Dr. Caloras and Dr. Boucher, and picked only the medical evidence which supported the limited weight he assigned to their opinions while ignoring contrary evidence. She also claims the opinion relies too heavily on a non-examining State Agency Physician, Dr. Familant, and that the ALJ improperly assessed her credibility. Id. at 19.

---

[2] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

a.     **The ALJ Properly Explained the Weight Assigned to All Medical Source Statements.**

Cook first contends that the ALJ erred by improperly considering and evaluating the evidence, including the medical source statement submitted by her treating physician, Dr. Caloras, and the records from an evaluation by occupational medicine specialist, Dr. Boucher. She also argues the ALJ assigned too much weight to the opinion evidence from a DDS physician who practices as a pediatrician and did not even examine her.

As stated previously, the ALJ alone has the responsibility of determining RFC.  In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants.  In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source.  Id. at § 404.1527(d)(1)-(2).  A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2).  Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still

entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.).   When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. at § 404.1527(d)(2).[3]

In this case, the ALJ specifically assigned little weight to the medical source opinion of Dr. Caloras, a treating physician.   The ALJ assigned three reasons for his assessment, all of which are supported by his analysis and the medical record.   First, he noted that Dr. Caloras was a family practitioner and not an orthopaedic specialist.   (R. 30).   This factor is explicitly required to be considered by the rules.   20 C.F.R. § 404.1527.   It is also relevant to the ALJ's conclusions because, despite their allegedly disabling nature, Cook did not seek more specialized treatment for her back pain symptoms after 2010.   The ALJ also noted that much of Cook's earlier treatment was provided by orthopaedic specialists.   (R. 30) (citing exhibits).

The second reason the ALJ discounted Dr. Caloras's opinion is that he apparently saw her relatively few times during the years immediately preceding the November 21, 2013 hearing on her claim.   (R. 30).   Cook does not dispute this aspect of the ALJ's supporting analysis, except to note that the agency physician whose opinion he credited had not examined her at all. But the ALJ did not rely on any examination by Dr. Familant in crediting his opinion, instead noting that he found it more consistent with the medical evidence.   And it remains the case that the medical records of treatment by Dr. Caloras conclude over a year before the hearing, except for Dr. Caloras's updated statement in 2013 renewing the view he earlier expressed regarding Cook's symptoms.   (R. 830).

Finally, and most importantly, the ALJ noted that Dr. Caloras's opinion – delivered

---

[3] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, non-treating sources, State Agency consultants, and other non-examining sources.   20 C.F.R. § 404.1527(f)(2)(ii).

14

primarily in check-the-box forms prepared for litigation — were inconsistent with "his own prognosis notes, other medical source opinions, and the Claimant's own course of treatment and objective findings." (R. 30). In addition to stating this reason, the ALJ proceeded to document the detailed inconsistencies he referred to. He cited relatively modest abnormalities, or entirely normal objective findings in medical records from 2009 to 2011. (R. 30-31). He observed, as did Cook's physicians, that her "complaints are out of proportion with her physical examinations, which have often contained many benign findings." (R. 31).

In response to the ALJ's analysis, Cook has identified several objective findings she claims the ALJ ignored or overlooked. These findings, included recorded observations of "a deliberate gait," "mild spasm," "mildly reduced [ ] range of motion," and "moderate soft tissue tenderness." (ECF No. 10, at 16). The brief also cited to the MRI reports reflecting L-5 spondylolysis, and "multiple Schmorl's nodes."[4] But again, these findings are not inconsistent with the weight assigned by the ALJ. They are exactly the sort of relatively benign findings which the ALJ concluded were insufficient to support her claims of work-disabling pain. The ALJ did not conclude that Cook had no impairments. To the contrary, he noted that she suffered from both spondylosis and degenerative disc disease, which he also observed could produce the objective findings and symptoms she complained of. The findings Cook now relies upon do not undermine the substantial evidence supporting the ALJ's RFC finding. In fact, they are entirely consistent with the modified light RFC he imposed.

Finally, the Questionnaire completed by Dr. Caloras is not itself a medical record. Such check-the-box forms without any medical explanation or justification are not entitled to great weight, even when completed by a treating physician. Leonard v. Astrue, 2012 WL 4404508, at

---

[4] Schmorl's node is an irregular bone defect in the vertebra. Dorland's Illustrated Medical Dictionary 1300 (31st ed. 2007).

*4 (W.D. Va. Sept. 25, 2012) (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)).

After reviewing the complete record and the ALJ's analysis, the undersigned finds no error in the

ALJ's explanation of the weight assigned to Dr. Caloras's medical source opinion.

      Cook also faults the ALJ's analysis of opinions offered by Dr. Boucher, an occupational

medicine specialist, who saw her shortly after her work-related back injury.  She contends the

ALJ erred by assigning little weight to Dr. Boucher's opinions "simply because this physician

evaluated Ms. Cook on one occasion."  (ECF No. 16, at 18).  Again, Cook's briefing

misdescribes the ALJ's rationale.  His opinion assigned little weight to Dr. Boucher's

conclusions, in part because he had seen her only one time.  But the ALJ also noted that the

single visit occurred "early in the adjudicatory period" (January 13, 2010), less than twelve

months after her alleged onset date.  (R. 33).  As a result, Dr. Boucher's opinions "did not reflect

Cook's subsequent longitudinal functioning."  Id.  These additional observations are entirely

unchallenged by Cook and fully supported by the medical record.  Cook was injured at work

August 17, 2009.  She saw Dr. Boucher for an independent medical evaluation as part of a

worker's compensation claim on January 13, 2010, less than five months after her injury and

almost three years before the hearing.  In addition, his examination preceded an extensive course

of treatment and physical therapy at the Dartmouth Clinic, which, as the ALJ also noted,

produced significant improvement in her condition.  (R. 565).

      With regard to the non-examining agency physician, Dr. Familant, Cook argues the ALJ

credited his findings without regard to the contrary medical evidence from her treating

physicians.  State Agency reviewers like Dr. Familant are non-examining sources.  Where a

treating source is not given controlling weight, non-examining source opinion evidence must be

assessed by reference to the factors set forth in 20 C.F.R. §§ 404.1527(c)(1)-(6).  See 20 C.F.R. §

404.1527(e)(2)(ii). But ALJs "are not bound by any findings made by State Agency medical or psychological consultants, or other program physicians or psychologists." Id. at § 404.1527(e)(2)(i). Although they must consider State Agency medical consultant findings and opinions as opinion evidence, the "ultimate determination about whether" an individual is disabled is clearly reserved for the ALJ. Id.

Here, the ALJ properly exercised his authority to determine Cook's RFC after considering all the evidence, including the opinions of agency physicians. Cook argues that the ALJ "relied entirely on opinions from the non-examining agency medical consultant" in arriving at his RFC. (ECF No. 10, at 17). She also faults the ALJ for relying on the agency doctor's opinion when his specialty – pediatrics – was also outside the specialty area required for Cook's impairments. Id. These arguments mischaracterize the depth of the ALJ's analysis. The ALJ relied more heavily on the agency consultant's opinion because he found it more consistent with the medical record, with Cook's own activity reports, and with her relatively benign clinical findings, all of which also support the ALJ's findings on her RFC. The ALJ also explicitly relied upon medical evidence of Cook's work-related functioning recorded following her treatment at the Dartmouth-Hitchcock Medical Center showing that she was functioning in the light/medium range following therapy. (R. 33, 565). This record, dated November 2010, showed she could lift 35 pounds frequently and 40 pounds occasionally (R. 565), and rebuts Cook's claim that the ALJ relied "entirely" on the Agency Consultant in arriving at her RFC.

> **b.** **The ALJ Correctly Assessed Cook's Credibility And Evaluated Her Complaints of Pain.**

Cook next argues that the ALJ erred in finding Cook's complaints of disabling limitations inconsistent with the medical record. (R. 29). The ALJ specifically found Cook's description of

her limitations only partially credible.

In deciding whether a plaintiff is disabled, the ALJ must consider all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. § 404.1529(a). A plaintiff's subjective statements about pain or other symptoms alone are not enough to establish disability. Id. Under both federal regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. First, the plaintiff must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594-95. "However, while a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including her own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. at § 404.1529(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. at § 404.1529(c)(3).

In evaluating the intensity and persistence of the plaintiff's symptoms and the extent to

which they affect her ability to work, the ALJ must consider whether inconsistencies exist and the extent to which there is conflict between the plaintiff's statements and the other evidence. Id. at § 404.1529(c)(4). According to the regulations, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id.

The ALJ concluded that Cook's description of her symptoms was not fully credible, and observed that, except for images of the meniscal tear in her left knee – which largely resolved following surgery – tests showed no significant pathology to account for her severe pain and limitation. (R. 30). An MRI of record – taken in 2009 – was described by her treating physician, Dr. Bell, as showing no significant abnormality. (R. 42). A later x-ray was essentially normal, and additional MRIs showed no evidence of stenosis at any level. An EMG study showed no evidence of radiculopathy or entrapment neuropathy, and were described by her treating physician as "unremarkable." (R. 30, 647). As set forth above, the ALJ also noted that many findings on her physical exams were essentially normal.

Thus, contrary to Cook's arguments, the ALJ did not substitute his own judgment for that of the treating physicians. He largely agreed – as her doctors noted – that Cook's complaints of disabling pain were "out of proportion to exam findings." (R. 586). The medical record, which the ALJ reviewed in detail, reflects little clinical evidence of disabling limitations and several observations by her treating physicians that suggest her complaints were not supported by objective findings. (R. 420) (Dr. Bell, "unexplained neuropathic symptoms" following "completely normal" exam of balance and strength; R. 423 "no significant objective findings to define what is causing this pain;" R. 586, Dr. Murray, "initially appeared uncomfortable in

sitting but as interview progressed appeared less so," "some nonorganic findings today"). The ALJ also observed that Cook's descriptions of her abilities during the hearing differed from other evidence in the medical record, which suggested she was exercising regularly, performing household chores, traveling and attending to all of her own personal care. (R. 32).

Despite the evidence that Cook was exaggerating her symptoms, the ALJ's RFC aligns closely with the limits Cook described. He imposed a sit/stand option, and limited her to light work with postural limitations on bending, stooping, and kneeling. To the extent Cook's testimony could be interpreted to require a more restrictive RFC, the ALJ explained his reasons for not so finding. He observed the inconsistency in her reported activities and noted that her physical exams frequently revealed minimal findings, and he observed that she had not sought specialized treatment in the year preceding the hearing. Thus, the ALJ met his burden under the rules to explain the basis of his credibility assessment.

## V.   **RECOMMENDATION**

Because the ALJ adequately explained the weight assigned to the medical source statements on the record, and his conclusion that Cook was not disabled is supported by substantial evidence, the undersigned RECOMMENDS that the Court DENY Cook's Motion to Remand (ECF No. 9), DENY Cook's Motion for Summary Judgment (ECF No. 8), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 11), and AFFIRM the final decision of the Commissioner.

## VI.   **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

July 13, 2016